United States District Court
Southern District of Texas
**ENTERED**
June 26, 2020
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JAMAYAL HANNER, § | |
| § | |
| *Plaintiff*, § | |
| § | |
| v. § | Civil Action No.: 4:19-cv-02032 |
| § | |
| ANDREW SAUL, § | |
| COMMISSIONER OF THE § | |
| SOCIAL SECURITY ADMINISTRATION, § | |
| § | |
| *Defendant*. § | |

## MEMORANDUM AND RECOMMENDATION

Hanner filed this action under the Social Security Act, 42 U.S.C. §§ 405(g), for review of the Commissioner's final decision denying his request for disability insurance benefits. Hanner and the Commissioner moved for summary judgment. Dkt. 14, 15. Having considered the filings, the record, and the applicable law, the Court **DENIES** Hanner's Motion, **GRANTS** the Commissioner's Motion, and **AFFIRMS** the Commissioner's final decision.[1]

### I. BACKGROUND

**1. Factual and Administrative History**

Hanner filed a claim for disability insurance benefits on February 27, 2017, alleging a disability onset date of February 8, 2017. Tr. 13. Hanner has a number of alleged disabilities deemed severe by the ALJ: post-traumatic stress disorder ("PTSD"), adjustment disorder, major depressive disorder, alcohol use disorder, osteoarthritis of the hip post reconstructive surgery, plantar fasciitis, and obesity. Tr. 15. The agency denied Hanner's claim on initial review on April

---

[1] Chief District Judge Lee H. Rosenthal referred these Motions to the Magistrate Judge for report and recommendation. Dkt. 4.

1

19, 2017 and on reconsideration on July 10, 2017.  Tr. 89-101, 103-117.  An administrative law judge ("ALJ") held a hearing on August 27, 2018 at which Hanner and a vocational expert testified.  Tr. 71-88.  The ALJ denied Hanner's application for benefits on October 18, 2018.  Tr. 22.  The Appeals Council denied review on April 19, 2019, and the ALJ's decision became the final decision of the Commissioner.  Tr. 1-5; see 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).

## 2. Standard for Review of the Commissioner's Decision

Federal court review of the Commissioner's final decision to deny Social Security benefits is limited to two inquiries: (1) whether the Commissioner applied the proper legal standard; and (2) whether the Commissioner's decision is supported by substantial evidence.  *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018).  When reviewing the Commissioner's decision, the Court does not reweigh the evidence, try the questions *de novo*, or substitute its own judgment for that of the Commissioner.  *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  *Id*.

## 3. Disability Determination Standards

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The ALJ must follow a five-step sequential analysis to determine whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920.

At the first step, the ALJ decides whether the claimant is currently working or "engaged in substantial gainful activity."  *Id*. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If so, the claimant is not disabled.  At the second step, the ALJ must determine whether the claimant has a severe impairment.  *Id*. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the claimant's impairment does not

have a de minimis impact on her ability to work, she is not disabled. *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018). The third step of the sequential analysis requires the ALJ to determine whether the claimant's severe impairment meets or medically equals one of the listings in the regulation known as Appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); 20 C.F.R. § pt. 404, subpt. p, app. 1 [hereinafter "App. 1"]. If so, the claimant is disabled. If not, the ALJ must determine the claimant's "residual functional capacity" (RFC), which is the claimant's ability to do physical and mental tasks on a sustained basis despite limitations from her impairments. *Giles v. Astrue*, 433 Fed. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545). At step four, the ALJ determines whether the claimant's RFC permits her to perform her past relevant work. If the answer is no, the ALJ determines at step five whether the claimant can perform any other work that exists in the national economy. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). The claimant bears the burden to prove disability at steps one through four, but the burden shifts to the Commissioner at step five. *Newton v. Apfel*, 209 F.3d at 452-53.

   **4. The ALJ's Decision**

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ determined that Hanner met the insured status requirements of the Social Security Act through December 31, 2021. Tr. 15. The ALJ found that Hanner had not engaged in substantial gainful activity since February 8, 2017. *Id*. The ALJ further concluded that Hanner suffers from the following severe impairments: PTSD, adjustment disorder, major depressive disorder, alcohol use disorder, osteoarthritis of the hip post reconstructive surgery, plantar fasciitis, and obesity. *Id*. The ALJ found Hanner does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in Appendix 1 after specifically consider Listings 1.02A, 12.04, and 12.06. Tr. 15-16. The ALJ determined Hanner has the RFC for light work except he may:

> [n]ever climb ladders, ropes, or scaffolds, but can occasionally balance, stoop, kneel, crouch, and crawl. The claimant cannot have any exposure to weather extremes, including heat, cold, wetness, or humidity and he cannot have any exposure to dust, fumes, gases, chemicals, odors, poor ventilation, or other pulmonary irritants. He can understand, remember, and carry out simple, routine tasks involving simple work related instructions, He cannot have any interaction with the public and can have occasionally interaction with coworkers and supervisors.

Tr. 17. Relying on the testimony of a vocational expert, the ALJ determined Hanner is unable to perform any past relevant work. Tr. 21. The ALJ determined the transferability of Hanner's previous job skills was immaterial to the disability determination because the Medical-Vocational Rules support a finding of not disabled whether or not Hanner has transferable job skills. *Id*. The ALJ further concluded that Hanner could perform other work that exists in significant numbers in the national economy. Tr. 22. For these reasons, the ALJ concluded Hanner is not under a disability as defined by the Social Security Act and denied his application for benefits. *Id*.

## II. ANALYSIS

In support of his Motion, Hanner argues two points of error. First, Hanner argues the ALJ erred in assigning little weight to Hanner's treating psychiatrist's opinion and multiple global assessment of functioning ("GAF") ratings in the record. Dkt. 14 at 7-10. Second, he argues the ALJ erred in relying on the vocational expert's testimony that Hanner could perform jobs requiring reasoning levels of two and three when the ALJ's own RFC finding limited Hanner to "simple, routine tasks involving simple work related instructions." *Id*. at 2-6.

**1. The ALJ did not err in assigning little weight to certain medical opinion evidence.**

*a. Treating psychiatrist opinion*

By means of a questionnaire, Dr. Heekin opined that Hanner had limitations in his mental abilities to perform a wide variety of job-related tasks as set forth below:

4

| Mental Abilities & Aptitude Needed to Do Any Job | Unlimited/ Very Good | Good | Fair | Poor/ None |
|---|---|---|---|---|
| Interact appropriately with the general public | | | | X |
| Maintain socially appropriate behavior | | | X | |
| Adhere to basic standards of neatness and cleanliness | | | X | |
| Travel in unfamiliar place | | | | X |
| Use public transportation | | | | X |
| Remember work-like procedures | | | X | |
| Understand and remember very short and simple instructions | | | X | |
| Carry out very short and simple instructions | | | X | |
| Maintain attention for two hour segment | | | | X |
| Maintain regular attendance and be punctual within customary, usually strict tolerances | | | | X |
| Sustain an ordinary routine without special supervision | | | | X |
| Work in coordination with or proximity to others without being unduly distracted | | | | X |
| Make simple work-related decisions | | | X | |
| Complete a normal workday and workweek without interruptions from psychologically based symptoms | | | | X |
| Performa at a consistent pace without an unreasonable number and length of rest periods | | | | X |
| Ask simple questions or request assistance | | | X | |
| Accept instructions and respond appropriately to criticism from supervisors | | X | | |
| Get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes | | | | X |
| Respond appropriately to changes in a routine work setting | | | X | |
| Deal with normal work stress | | | | X |
| Be aware of normal hazards and take appropriate precaution | | | X | |
| Understand and remember detailed instructions | | | | X |
| Carry out detailed instructions | | | X | |
| Set realistic goals or make plans independently of others | | | X | |
| Deal with stress of semiskilled and skilled work | | | | X |

Tr. 584-86. The ALJ assigned little weight to this opinion, citing the brief length of Dr. Heekin's treatment relationship with Hanner and the overall lack of objective evidence in the record to support the opinion. Tr. 20. Hanner argues the ALJ erred by assigning little weight to the opinion based on the length of treatment because Dr. Heekin had examined him "four times more than the

5

state agency psychologists, to whose opinions the ALJ gave more weight." Dkt. 14 at 8. He also argues the medical record supports Dr. Heekin's opinion regarding Hanner's limitations as identified in the questionnaire responses. *Id*. at 9-10.

To begin with, Fifth Circuit precedent requires an ALJ to give controlling weight to a treating physician's opinion only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent" with other substantial evidence in the record. *Newton v. Apfel*, 209 F.3d at 455 (citations omitted). Furthermore, an ALJ may discount the weight assigned to a treating physician's opinion for "good cause." *Id*. at 455-56 (citations omitted). Good cause exists to discount a treating physician's opinion when it is "brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, *or* otherwise unsupported by the evidence." *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001) (emphasis added) (citations omitted). When good cause is shown, the ALJ may assign less weight, little weight, or even no weight to a treating physician's opinion. *Perez v. Barnhart*, 415 F.3d 457, 466 (5th Cir. 2005) (citations omitted).

Dr. Heekin's opinion of Hanner's functional abilities consists only of responses to a check-the-box form questionnaire with no narrative discussion aside from his note that Hanner "has severe PTSD due to combat-related experiences. He continues to have daily suicidal thoughts and auditory hallucinations, as well as symptoms of hyperarousal and hypervigilance." Tr. 586. Treating physician opinions consisting of nothing more than responses to a "questionnaire" are recognized in this circuit as "brief or conclusory" testimony not entitled to controlling weight. *Foster v. Astrue*, 410 F. App'x. 831, 833 (5th Cir. 2011) (affirming the ALJ's decision giving little weight to treating physician's questionnaire opinion due to its brief and conclusory nature and lack of explanatory notes or supporting objective tests); *Roberts v. Colvin*, Civil Action No. 3:12-CV-

6

397 HTW-LRA, 2013 WL 4678556, at *5 (S.D. Miss. Aug. 30, 2013) (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3rd Cir. 1993) (citations omitted) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best . . . [but when] these so-called reports are unaccompanied by thorough written reports, their reliability is suspect."); *Heck v. Colvin*, 674 F. App'x. 411, 415 (5th Cir. 2017) (quotations omitted) ("[The Fifth Circuit] has previously characterized responses to a 'questionnaire format as typical brief or conclusory testimony' and declined to accord these responses controlling weight when they lack 'explanatory notes' or 'supporting objective tests and examinations.'").

Furthermore, the ALJ provided additional "good cause" for assigning only little weight to Dr. Heekin's opinion. The length of the treatment relationship and frequency of examination is a factor to be considered in weighing medical opinions. 20 C.F.R. § 404.1527(c)(2). Generally, the longer a treating source has treated the claimant and the more times a claimant has been seen by the treating source, the more weight an ALJ will give to the treating source's opinion. *Id*. § 404.1527(c)(1). As noted by the ALJ, Dr. Heekin treated Hanner for a short period. Tr. 20, 584-86. Prior to completing the questionnaire opinion, Dr. Heekin saw Hanner only four times over the course of approximately two and a half months. Tr. 584-86, 664-65, 676, 673.

Finally, the ALJ did not err in finding Dr. Heekin's opinion is not supported by Hanner's medical records during the relevant period. Tr. 20. Dr. Heekin's records reveal complaints regarding depression, anxiety, sleep problems, and passive suicidal ideation, (Tr. 664, 666, 673, 677) but contain no evidence regarding Hanner's mental limitations with respect to work tasks. In his Motion, Hanner lists evidence which he argues is illustrative of a more restrictive RFC.[2] Dkt.

---

[2]The evidence includes complaints of distressing memories and dreams of trauma, psychological distress and reactions, avoidance of distressing memories or external reminders of trauma, a tendency to blame himself or others, diminished interest in activities, a negative emotional state with an inability to experience positive emotion, irritability, hypervigilance, exaggerated startle response, sleep disturbance, hallucinations, and paranoia. Dkt. 14 at 9-10.

7

14 at 9-10. However, to the extent Hanner suggests this evidence should have been given greater weight by the ALJ, he is asking the Court to reweigh the evidence, something the Court is not permitted to do. *See Laffoon v. Califano*, 558 F.2d 253, 254 (5th Cir. 1977) (citations omitted) ("The role of the reviewing court is quite limited. It may neither reweigh the evidence nor substitute its judgment for that of the Secretary.").

### b. GAF scores

The ALJ also assigned little weight to Hanner's multiple GAF ratings, finding he endured "major situational stressors" during each of the GAF assessment periods but ultimately improved with treatment. Tr. 20-21. Hanner argues the ALJ erred by rejecting the GAF ratings because the record is "replete" with clinical findings related to Hanner's mental impairments and includes evidence that supports a more restrictive RFC. Dkt. 14 at 9-10.

A claimant's GAF scores "are not determiners of an ability or inability to work." *McMurray v. Colvin*, Civil Action No. G-16-017, 2017 WL 978706, at *4 (S.D. Tex. Mar. 14, 2017) (citations omitted). The Commissioner does not endorse use of GAF scores to determine disability and federal courts have likewise declined to find a strong correlation between a claimant's GAF score and the ability to work. *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764-65 (Aug. 2000) (explaining a claimant's GAF score "does not have a direct correlation to the severity requirements in our mental disorders listings."); *Jackson v. Colvin*, Civil Action No. 4:14-CV-756-A, 2015 WL 7681262, at *3 (N.D. Tex. Nov. 5, 2015) (citing 65 Fed. Reg. 50,764, 60,745-65 (Aug. 2000)). In fact, in the updated version of the Diagnostic and Statistical Manual of Mental Disorders, the American Psychiatric Association no longer recommends the use of GAF scores as a diagnostic tool for assessing a patient's functioning due to its "conceptual lack of clarity . . . and questionable

psychometrics in routine practice." *Spencer v. Colvin*, No. EP-15-CV-0096-DCG, 2016 WL 1259570, at *6 n.8 (W.D. Tex. Mar. 28, 2016) (quoting American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). Finally, while the "GAF scale is intended for use by practitioners in making treatment decisions . . . GAF scores have a limited significance in a disability controversy because they do not necessarily relate to whether a claimant is disabled under the Act and may indicate problems that do not necessarily relate to an ability to hold a job." *Harris-Nutall v. Colvin*, Civil Action No. 3:15-CV-3334-D, 2016 WL 3906083, at *5 (N.D. Tex. July 19, 2016).

Although a GAF score does not determine disability, the ALJ is required to review the scores as part of the evidence of record and, based on the entire record, make a disability determination on a case-by-case basis. *McMurray v. Colvin*, Civil Action No. G-16-017, 2017 WL 978706, at *4 (citations omitted). The ALJ may discredit a GAF score if it is internally inconsistent or contradicted by other medical evidence. *Brown v. Astrue*, Civil Action No. 11-CV-03525, 2012 WL 9392190, at *9 (S.D. Tex. June 21, 2012) (citing 20 C.F. R. § 404.1527(c)(2); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994)). The ALJ retains the sole responsibility to weigh evidence such as GAF scores when determining a claimant's RFC. *Gonzales v. Astrue*, 231 F. App'x. 322, 324 (5th Cir. 2007) (citations omitted). The Court is not permitted to reweigh the evidence, including Hanner's GAF scores. *See Savage v. Barnhart*, 372 F. Supp. 2d 922, 927 (S.D. Tex. 2005).

In this case, the ALJ's written decision makes clear the ALJ considered Hanner's GAF scores in determining his RFC. Tr. 20-21. The ALJ explicitly discussed the GAF scores, assigned them little weight, and gave an explanation for doing so. Tr. 20-21. The ALJ's written decision demonstrates he did not commit legal error in his treatment of the GAF scores. *See Harris-Nutall*

9

*v. Colvin*, 2016 WL 3906083, at *6 (finding no error where the ALJ explicitly discussed a claimant's GAF score and assigned it little weight because "the ALJ's explicit discussion of [the claimant's] GAF scores satisfied her duty under the regulations."); *cf. Ayala v. Saul*, 2020 WL 1226879, at *4 (N.D. Tex. Mar. 13, 2020) (citing *Winston v. Berryhill*, 755 F. App'x 395, 398 (5th Cir. 2018)) (finding error where the ALJ failed to explicitly discuss the claimant's GAF scores).

Additionally, the record confirms that Hanner's symptoms of PTSD and depression are exacerbated by situational stressors and alcohol misuse and improve with therapy and medication:

- In February 2017, Hanner reported a history of nightmares, problems concentrating, feeling "zoned out" at home, and occasionally hearing voices in his head. *Id*. In April, his nightmares had decreased in intensity and frequency and he reported his mood had improved with therapy and medication. Tr. 794. Hanner's condition was then largely unchanged until October 2017.

- In October 2017, Hanner presented to the emergency room saying he wanted to cut the throat of his former supervisor. Tr. 768-71. Once he was told police would have to be notified of a specific threat, said he did not intend to follow through. Tr. 762. Hanner felt "everyone is leaving him," noting his mother was deceased, his father was in a drug rehabilitation program, two of his friends had died during Hurricane Harvey, and his third wife had left him a few months prior. Tr. 761. He reported increased alcohol consumption and "talking to" deceased friends. *Id*. His mental status exam during the October hospital visit showed depressed mood with constricted affect, homicidal ideation, and variable judgment. Tr. 763. Although he was considered undermedicated and was advised to increase his medication dosages, he was discharged the same day. Tr. 766. Ten days later, Hanner's homicidal and suicidal ideations had stopped, and his mental status exam showed depressed mood but was otherwise normal. Tr. 756.

- By the end of October, Hanner was again experiencing suicidal thoughts and depression. Tr. 738. His mental status exam showed psychomotor retardation, dysthymic[3] mood, and blunting. Tr. 739. However, Hanner did not receive mental health treatment again until December. Tr. 736-37.

- On December 1 Hanner had continued suicidal thoughts, but they returned to baseline two weeks later with no increase in frequency or intensity. Tr. 735-37. His mental status exam showed dysthymic mood but no psychomotor retardation or blunting. *Id*.

---

[3]Dysthymia is defined as "a mood disorder characterized by chronic mildly depressed or irritable mood often accompanied by other symptoms (such as eating and sleeping disturbances, fatigue, and poor self-esteem). *Dysthymia*, Merriam-Webster Medical Dictionary (11th ed. 2016).

- On December 26, Hanner was admitted to the emergency room for a second time with reports of suicidal thoughts. Tr. 733-34. Hanner said his symptoms worsened because he felt lonely during the holidays. Tr. 721. His mental status exam showed stable constricted mood, some paranoia, and intermittent passive suicidal ideations. Tr. 723. He was discharged the same day to a friend's house with increased medication. Tr. 725. He continued to experience some intermittent suicidal ideations without any intent of follow through in January 2018. Tr. 712.

- Hanner's mental state seemed to improve throughout February and March 2018, In February, Hanner still had some symptoms, but he reported therapy was going well. Tr. 705. A February mental status exam showed no psychomotor retardation or delusions but showed dysthymic affect with emotional blunting. Tr. 701. In March, Hanner confirmed his symptoms had continued to improve. Tr. 693. His alcohol use was noted as a likely contributor to his symptoms. *Id.*

- Hanner's symptoms worsened again in April 2018 after his cousin attempted suicide. Tr. 667-68. He continued to struggle with depression and sleep through April and May 2018. His treating psychiatrist suggested Hanner voluntarily commit himself on April 30, but Hanner refused. Tr. 664.

- In June 2018, Hanner reported he still felt depressed but that he had decreased his alcohol consumption and was improving, particularly with respect to his suicidal ideations. Tr. 652.

- In July, Hanner reported he was having some relief with Gabapentin and that increasing his dose had helped his nightmares. Tr. 633. He continued to have suicidal thoughts but had no plans to follow through. Tr. 646. He had a normal mental status exam and reported "pretty good" mood. Tr. 634.

In this case, the ALJ did not err in assigning little weight to the GAF scores. The ALJ's written decision clearly demonstrates that he considered the scores and assigned them little weight because they were determined during periods of situational stress. *See Harris-Nutall v. Colvin*, 2016 WL 3906083, at *6 (N.D. July 19, 2016) (finding the ALJ did not err where the written decision demonstrated the ALJ considered the claimant's GAF scores and assigned them little weight because they conflicted with other record evidence). Similarly, the ALJ did not err in assigning little weight to Dr. Heekin's opinion given its brief, questionnaire format and lack of explanatory notes or other supporting evidence. *See Heck v. Colvin*, 674 F. App'x. 411, 415 (5th Cir. 2017) (quotations omitted) (explaining responses to a questionnaire are considered brief or

11

conclusory testimony and are not entitled to controlling weight were they lack explanatory notes or supporting evidence).

**2. The ALJ did not err in relying on the vocational expert's testimony at step five.**

In this case, the ALJ limited Hanner to "simple, routine tasks involving simple work related instructions." Tr. 17. The vocational expert, after confirming he would inform the ALJ of possible conflicts between his testimony and the Dictionary of Occupational Titles ("DOT"),[4] testified that Hanner could perform three occupations with reasoning levels ranging from two to three. 207.685-014, Photocopying-Machine Operator, 1991 WL 672696 (4th ed. 1991); Shipping and Receiving Weigher, 222.387-074, 1991 WL 672696 (4th ed. 1991); Mail Clerk 209.687-026, 1991 WL 672696 (4th ed. 1991). Hanner argues the ALJ erred by relying on the vocational expert's testimony that he could perform those jobs because they require a reasoning level of two or three, which Hanner agues is in conflict with the ALJ's RFC determination limiting Hanner to "simple, routine tasks involving simple work related instructions." Tr. 17. Hanner contends that, as a result of the error, the ALJ was unable to accurately identify jobs he could perform that exist in the national economy and remand is required. Dkt. 14 at 3.

The DOT provides the reasoning level required to perform particular jobs, along with other requirements. SSR 00-4p clarifies that "[t]he DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A [vocational expert] or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT." SSR 00-4p, 2000

---

[4]Pursuant to SSR 00-4p, in *all* cases the ALJ has an affirmative responsibility to ask the vocational expert whether her testimony has any possible conflict with the DOT. *Gaspard v. Soc. Sec. Admin. Com'r*, 609 F. Supp. 2d 607, 613 (E.D. Tex. 2009) (quoting SSR 00-4p, 2000 WL 1898704, at *4). Prior to the vocational expert's testimony in this case, the ALJ asked, "[Y]ou understand that if your opinion conflicts with the [DOT], you will need to advise us of the conflict and the basis for the opinion?" Tr. 84. The vocational expert confirmed he would and later identified no conflict. *Id*.

WL 1898704, at *3 (Dec. 4, 2000). An ALJ, therefore, is permitted to rely on both the DOT and a vocational expert's testimony in determining whether a claimant can adjust to alternative available work. *See* 20 C.F.R. § 404.1566(d)-(e).

Because the ALJ is permitted to rely on multiple sources of information at step five, it is "foreseeable (if not inevitable) that in some cases a vocational expert's opinion may, as to a particular claimant's ability to perform alternative work, conflict with the DOT's explanation of the requirements for particular jobs." *Veal v. Soc. Sec. Admin.*, 618 F. Supp. 2d 600, 609 (E.D. Tex. 2009). In cases with conflicts, an ALJ may give greater weight to vocational expert testimony than to the findings in the DOT; however, the ALJ's discretion in choosing between conflicting evidence is not unlimited. *Id.* Where a conflict is *direct and obvious*, the ALJ is required to explain or resolve the conflict. *Id.* Where the conflict is only *tangential, implied, or indirect*, the ALJ may properly rely on the vocational expert's testimony without resolving the conflict so long as the record reflects an adequate basis for doing so. *Id.* (citing *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000)).

A direct conflict occurs where "the vocational expert's characterization of the exertional or skill level required for a particular job is facially different from the exertional or skill level provided for that job in the DOT." *Carey v. Apfel*, 230 F.3d 131, 145-46 (5th Cir. 2000). In this case, the ALJ did not limit Hanner to a specific reasoning level. Therefore, there is no direct and obvious conflict between the DOT and the vocational expert's testimony. *See Arrington v. Colvin*, Civil Action No. 4:12-cv-01390, 2013 WL 12100718, at *12 (S.D. Tex. Sep. 18, 2013) (finding no direct conflict between the DOT and the vocational expert's testimony where the claimant was limited to simple, repetitive tasks and the vocational expert testified the claimant could perform some jobs with a reasoning level of two or above); *see also Gonzalez v. Astrue*, Civil Action No.

13

H-11-01439, 2012 WL 1458094 (S.D. Tex. Apr. 26, 2012) (finding the vocational expert's testimony and the DOT did not conflict because the claimant was restricted to "simple" and "repetitive tasks," but was not restricted to a specific reasoning level); *see also Veal v. Soc. Sec. Admin.*, 618 F. Supp. 2d at 612 (explaining a "limitation of simple, one or two-step tasks on a repetitive basis does not *necessarily* preclude one's ability to perform jobs with reasoning level 2 or higher.").

Because no direct and obvious conflict exists in this case, any purported conflict between the vocational expert's testimony and the DOT is implied. *Arrington v. Colvin*, 2013 WL 12100718, at *12 (citing *Gaspard v. Soc. Sec. Admin. Com'r*, 609 F. Supp. 2d 607, 607 (E.D. Tex. 2009)). In order to obtain a remand based on an implied conflict, the claimant must raise the conflict between the expert's testimony and the DOT at the administrative level. The Fifth Circuit has explained that

> claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing.

*Carey v. Apfel*, 230 F.3d at 146-47. Although Hanner was represented by counsel who cross-examined the vocational expert at the administrative hearing, none of the questions posed to the vocational expert addressed the issue of a conflict between the DOT and Hanner's RFC. Tr. 67. Due to Hanner's failure to raise the issue of a conflict at the hearing, he is not entitled to remand on that basis now. *See Arrington v. Colvin*, 2013 WL 12100718, at *12 (citation omitted) (citing *Carey v. Apfel*, 230 F.3d at 146-47) ("Because [the claimant's attorney] did not explore these alleged conflicts at the hearing, the ALJ's decision to rely on the vocational expert's testimony does not require a remand now.").

### III.  CONCLUSION

For the reasons stated above, the Court concludes the ALJ did not err in relying on the vocational expert's testimony or in his treatment of the GAF scores and Dr. Heekin's opinion. Therefore, the Court recommends the Commissioner's Motion be **GRANTED**, Hanner's Motion be **DENIED**, and the final decision of the Commissioner be **AFFIRMED**.

The Clerk of Court shall send copies of the Memorandum and Recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c).  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.  *Douglass v. United Servs. Auto. Ass'n.*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), superseded by statute on other grounds.

Signed at Houston, Texas on June 26, 2020.

_____
Christina A. Bryan
United States Magistrate Judge